**In re George Michael MONTROSS, Debtor.**

**Edward M. WALSH, Trustee, Appellant,**

v.

**TOWNSQUARE ASSOCIATES; Christo D. Bardis; John D. Reynan, Appellees.**

**BAP No. NC–96–1559–RRYME.**
**Bankruptcy No. 94–31395–WTC.**
**Adv. No. 94–3476–TC.**

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted May 23, 1997.

Decided June 20, 1997.

Iain A. MacDonald, Law Offices of Iain A. MacDonald, San Francisco, CA, for Edward M. Walsh.

Dennis D. Davis, Goldberg, Stinnett, Meyers & Davis, San Francisco, CA, for Townsquare Associates.

RUSSELL, RYAN and MEYERS, Bankruptcy Judges.

*OPINION*

RUSSELL, Bankruptcy Judge:

The trustee appeals the bankruptcy court's decision which denied his claims for relief pursuant to §§ 547,[1] 548, and 549 to recover the funds the debtor transferred into a partnership's bank accounts on the ground that the partnership was not a transferee within the meaning of § 550, and which denied his claims to recover the funds the debtor transferred into two non-partnership bank accounts because they did not belong to the estate. We AFFIRM.

## I. FACTS

In June of 1978, one of the appellees, Townsquare Associates, a limited partnership ("Townsquare" or "partnership,"), was formed "to purchase, hold, improve, maintain, manage and dispose of the 136 unit apartment house at 509 Popular Avenue, Millbrae, California." The partnership originally consisted of TCR Investment & Management, Inc., as general partner, and thirty-three limited partners. In July of 1983, the debtor, G. Michael Montross ("Montross"), replaced TCR Investment as the general partner. In February of 1984, Thomas Winn became a general and limited partner, and certain other limited partners withdrew.

In November of 1984, the structure of the partnership changed pursuant to a Fifth Amendment To Agreement Of Limited Partnership ("Agreement"). Appellees Christo Bardis and John Reynen became the new general partners under the Agreement, and Winn and Montross allegedly withdrew as general partners but remained as the sole limited partners. Although the chapter 7 trustee ("trustee") alleges that Montross was reinstated as a general partner, the partnership continues to dispute it. The bankruptcy court in its decision assumed that Montross was a general partner.

The partnership retained Montross–Barber Investment ("MBI"), owned in part by Montross, as a property manager to replace tenants, collect rents, pay the bills of the apartment complex and account to the gener-

---

1. Unless otherwise indicated, all chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 and the Federal Rules of Bankruptcy Procedure, Rules 1001–9036.

al partners for the operations of the apartment complex. MBI agreed to manage the property without charge in lieu of Montross making an additional capital contribution. Although Montross was only a part-owner of MBI, the record reflects that he solely managed the property for MBI. The record does not indicate whether Montross solely managed MBI.

At some time prior to 1993, Montross began forging Townsquare documents. He filed several "Certificate Of Limited Partnership—Form LP–1" forms with the Secretary of State, which contained forgeries. Townsquare learned of these forgeries only after being sued by the trustee.

In 1993, Montross started to launder funds unrelated to the Townsquare property through Townsquare bank accounts. Montross laundered funds as follows: Townsquare maintained two accounts for the purpose of depositing its receipts and making disbursements; one was a checking account and the other was a money market account, into which he put both Townsquare rents and funds he was laundering. He would then transfer Townsquare rents from the money market account into the checking account and wire the laundered funds out to a variety of destinations. Montross was in possession of the check books and the bank records. While Montross' personal deposits and disbursements would appear on Townsquare's bank statements, Montross never showed these documents to anyone that he did not employ. In addition, only Montross and his agents were signatories on the accounts, thereby allowing him to maintain control over them.

Montross was able to carry out this deception for almost a year because he employed the two bookkeepers who kept track of the receipts and disbursements of the apartment complex. The two bookkeepers, Irene Hassler and Theresa Callahan, were employed directly by one of Montross' companies throughout the period of his management of the apartment complex. Hassler did not recognize that Montross was engaged in improper activity and did not alert Bardis or Reynen of what Montross was doing until after Montross disappeared.

Montross devised a scheme so that his laundering activities were not entered on Townsquare's books. The general partners received no records that reflected the laundering activity. Montross caused his bookkeepers to maintain a clean check disbursement journal and a cash receipts journal for Townsquare. With one exception in the cash receipts journal which appears to be an oversight by Montross, none of Montross' laundering transactions appear in Townsquare's cash receipts or cash disbursements journals. Instead, Montross kept track of his laundering activities by having Irene Hassler keep a secret handwritten ledger.

Montross also prepared income and expense reports which were supplied on a monthly basis to general partners Bardis and Reynen. These financial statements appeared consistent with the legitimate activity of Townsquare's apartment complex. None of the money laundering transactions were reflected in the financial statements.

Montross' money laundering scheme was not readily apparent because it took place over a short period of time and because Townsquare's real estate generated a positive cash flow. Thus, Montross was able to secretly move non-Townsquare funds in and out of the account.

Funds laundered by Montross were never used by Townsquare. In addition, no Townsquare agent other than Montross knew of the funds. For every dollar deposited into a Townsquare account by a Montross company, a dollar or more was transferred out of Townsquare's account to a Montross company or account. In fact, at all times after August, 1993, Montross was in a negative position with respect to his money laundering activity, having removed more than he deposited. However, with Townsquare's positive cash flow, Montross was able to disguise his money laundering scheme.

In addition, in December of 1992, Montross opened an account at Sunrise Bank in the name of "Townsquare." He opened this account by presenting a forged document entitled "Partnership Agreement" to the bank. Montross first started transferring Townsquare funds into the Sunrise Bank account in March of 1993. The funds disbursed from

the Sunrise account were never transferred back to Townsquare or used to pay Townsquare's expenses.

On November 24, 1993, Montross secretly filed a personal bankruptcy petition on the East Coast. As of the date of the filing, Montross had withdrawn $80,000 more from Townsquare's accounts than he had transferred into them. For over two months, he continued operating the Townsquare apartment complex without Reynen's or Bardis' knowledge of his criminal activity or his bankruptcy.

On December 29, 1993, Montross instructed Irene Hassler to open an account in the name of Townsquare at Peninsula Bank of Commerce using a false partnership agreement and to deposit two checks totalling $65,000, representing repayment of loans from him to Harmony Group and Sterling Suites (corporations in which Montross held substantial interests under the name Oxford Group Trust), into that account. Subsequently, Montross engaged in several transactions involving the account.

Montross filed a second bankruptcy case in the Northern District of California on December 20, 1993. On that date, there was $10,826.50 in the Sunrise Bank account. This balance was derived from a combination of deposits, much of which was stolen from Townsquare before the bankruptcy. By January 6, 1994, Montross had transferred all but $5,687.67 from those funds to himself or to other transferees for his benefit.

On January 6, 1994, Montross began a series of postpetition thefts of Townsquare's money, totalling $83,000, by transferring funds from Townsquare's regular bank account into the Sunrise Bank account. When the account was later frozen by the trustee, about $72,000 of those stolen funds remained in the Sunrise account. Thus, by the time the account was discovered, Montross had spent the estate's funds as well as a portion of the funds stolen from Townsquare.

In February of 1994, Montross telephoned Reynen and informed him that he was using the partnership's bank accounts for money laundering. He informed the partnership that the funds in the account had been depleted and that he would replenish the account by transferring the funds in his Sunrise account to the partnership. Bardis and Reynen immediately took control of the management of the apartment complex and hired a new accounting firm. They demanded turnover of the books and records from Montross' bookkeepers and began reviewing the books. Their new accountant confirmed that Montross had laundered funds through Townsquare's account by comparing Townsquare's cash receipts and disbursements journals to bank records. In addition, the accountant discovered that Irene Hassler had maintained a separate journal for Montross which recorded his money laundering activity.

On March 17, 1994, the trustee obtained a temporary restraining order which restrained activities in the Peninsula Bank account. On April 13, 1994, a preliminary injunction was issued which required the partnership to maintain the $65,000 that had been transferred into the account from the Harmony Group and Sterling Suites loans. Immediately thereafter, Bardis removed all but the $65,000 from this account and opened a new partnership account.

Between early 1993 and early 1994, Montross transferred nearly $725,000 into the partnership bank accounts. Montross then transferred over $800,000 out of the partnership bank accounts to entities with which he was closely associated, including Peninsula Bank of Commerce, Sterling Suites, Inc., Harmony, Inc., Oxford Group Trust (a trust operated at all relevant times under control of Montross), George R. Montross, Trustee (of Oxford Group Trust), Sunrise Bank, Rossmont Inc. ("Montross" inverted, a corporation owned and controlled by Montross), Charles Schwab & Company, Barbara Brown (Montross' former wife), and Patricia Montross (Montross' mother).

On November 9, 1994, the trustee commenced two adversary proceedings, entitled *Walsh v. Oxford Group Trust, et al.* and *Walsh v. Sunrise Bank, et al.* seeking to recover the funds transferred from the partnership bank accounts by Montross to several entities associated with Montross as preferential, fraudulent, and unauthorized postpetition transfers and for declaratory relief.

On November 24, 1995, the trustee commenced an additional adversary proceeding entitled *Walsh v. Townsquare Associates, et al.* alleging that the transfers into the partnership bank accounts were preferential under § 547(b), fraudulent under § 548(a) and California Civil Code § 3439.04, and unauthorized as postpetition transfers under § 549(a). The trustee further sought turnover of property pursuant to § 542 and recovery of assets for the benefit of the estate under § 550.

After the three proceedings were consolidated, the partnership filed a counterclaim and third-party complaint against both the trustee and Sunrise Bank. The partnership alleged that it was entitled to the funds held in the Sunrise Bank account. The estate also had asserted rights to the Sunrise account. The bankruptcy court consolidated the claims of the estate and the partnership to the funds in the Sunrise account. Sunrise interpled the funds and was dismissed from the action.

Pursuant to the consolidation order, all claims relating to Townsquare, Bardis, and Reynen were bifurcated and tried together. After a trial, the bankruptcy court stated on the record that the trustee could not avoid any of the payments made by Montross into partnership bank accounts and allowed Townsquare to recover the proceeds held in the Sunrise Bank account. The court further found that the funds held in the Townsquare Associates' Peninsula bank account were the property of Townsquare.

The court reasoned with respect to the causes of action for avoidance, the Peninsula Bank account, and the Sunrise bank account that the trustee could not avoid any of the payments made by Montross into the partnership accounts under §§ 547, 548 or 549 because the partnership was not a transferee from whom recovery would be permissible under § 550. Rather, the court found that the partnership did not have dominion and control over the funds.

Next, the court found that the funds in the Peninsula Bank account should be turned over to the partnership on the grounds that the account included only money belonging to the partnership and because the trustee was not going to be able to recover on the avoidance claims.

Finally, the court determined that the partnership's rights in the Sunrise account were superior to those of the trustee on the ground that the funds in the account did not belong to Montross.

The trustee appeals the bankruptcy court's decision, contending that the court misconstrued and misapplied § 550 as to the partnership bank account and erred in determining that the funds in the Peninsula and Sunrise bank accounts did not constitute property of the estate.

## II. ISSUES

1. Whether the partnership, whose bank account was used to launder monies by the debtor for purposes unrelated to the partnership, is a transferee within the meaning of § 550.

2. Whether the funds in the Peninsula bank account belong to the estate.

3. Whether the funds in the Sunrise bank account belong to the estate.

## III. STANDARD OF REVIEW

Legal conclusions are reviewed *de novo* and factual determinations are reviewed for clear error. *In re Cisneros,* 994 F.2d 1462, 1464 (9th Cir.1993). Clear error exists when, after examining the evidence, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *In re Tully,* 202 B.R. 481, 483 (9th Cir.BAP 1996).

Issues of statutory interpretation as questions of law are reviewed *de novo. In re Sierra Pacific Broadcasters,* 185 B.R. 575, 577 (9th Cir.BAP1995).

## IV. DISCUSSION

*Whether The Partnership, Whose Bank Account Was Used To Launder Monies By The Debtor For Purposes Unrelated To The Partnership, Is A Transferee Within The Meaning Of § 550*

1. *Townsquare bank account*
   a. *"Dominion" or "control" test*

A trustee may avoid transfers of property of the estate that were preferential pursuant

to § 547(b), fraudulent under §§ 548(a) and 544(b), unauthorized as postpetition transfers under § 549(a), and recover it for the benefit of the estate under § 550. A trustee may seek turnover of the property of the estate pursuant to § 542.

■ When a transfer is avoidable, § 550(a)[2] provides that a trustee may recover the avoided property or its value for the benefit of the estate from the initial transferee and the entity for whose benefit the transfer was made, and from any subsequent transferees, both immediate and mediate. *See In re Dominion Corp.*, 199 B.R. 410, 413 (9th Cir. BAP 1996); *see also In re Presidential Corp.*, 180 B.R. 233, 236 (9th Cir. BAP 1995).

■ The chain of potentially liable parties is cut off by a subsequent transferee who takes the property for value and in good faith. The initial transferee and the entity for whose benefit the transfer was made, however, are held strictly liable to the trustee. *In re Bullion Reserve of N. Am.*, 922 F.2d 544, 547 (9th Cir.1991).

Section 101(54) defines "transfer" as:

[E]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

However, the Code does not define the meaning of transferee. The absence of a definition for "transferee" and the harsh result of an overly literal approach to § 550 gave rise to the "conduit" defense to avoidance liability. *Dominion*, 199 B.R. at 413.

The accepted definition of transferee was developed in *Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890 (7th Cir. 1988), which established the "dominion" or "control" test:

Although the Bankruptcy Code does not define "transferee," and there is no legislative history on this point, we think the minimum requirement of status as a "transferee" is dominion over the money or other asset, the right to put the money to one's own purposes.

*Id.* at 893. This "dominion" or "control" test has been adopted by the Ninth Circuit. *Bullion Reserve*, 922 F.2d at 549; *Presidential*, 180 B.R. at 236.

In *Bullion Reserve*, the president of the debtor, Saxon, agreed to contribute $1.5 million to a corporation in exchange for an ownership interest. The directors of the corporation, Miller and Kopelson, had the corporation issue 100,000 shares of stock to Saxon. The debtor transferred $1.5 million to Saxon's personal account which was then loaned to the corporation in exchange for the 100,000 shares. When the debtor filed bankruptcy, the trustee sued both the directors of the corporation and Saxon to recover the money as a fraudulent transfer.

On appeal, the Ninth Circuit considered whether Miller was a subsequent transferee under § 550(a)(2). The Ninth Circuit concluded that Miller was not a transferee based on the "dominion" or "control" test. *See also Bonded Fin. Servs.*, 838 F.2d at 893.

An entity does not have dominion or control unless it is "free to invest the whole [amount] in lottery tickets or uranium stocks." *Id.* at 894. An entity without such dominion or control is deemed a "conduit" which is merely a facilitator without sufficient control over the funds passing through its hands to be considered a transferee of the transfer. *Dominion*, 199 B.R. at 413.

The trustee argues that Townsquare was a transferee and not a mere conduit of the laundered funds. Townsquare argues that it was a conduit without any "dominion" or "control" over the funds in its account and was only a middle link in Montross' money

---

**2.** Section 550 provides in pertinent part:

**§ 550. Liability of transferee of avoided transfer**

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

(2) any immediate or mediate transferee of such initial transferee.

laundering scheme. Townsquare further argues that it *never* had dominion or control over the funds that passed through its account.

The bankruptcy court held that Townsquare did not have control over the funds laundered through its account because only Montross and his employees had signatory authority to the account. None of the other Townsquare partners had signatory authority over the account and all were unaware that Montross was depositing funds other than the earnings from the Townsquare apartment building. In addition, Montross provided no information in the operating reports to the other partners regarding the deposits to the Townsquare account.

The bankruptcy court further found that the funds laundered through the account were not intended as a contribution to capital or as a loan to the partnership. Instead, the funds were intended to remain as Montross' property. Montross treated the money as his own by transferring funds in and out of the account without Townsquare's control or knowledge.

The bankruptcy court concluded that the trustee could not prevail on any causes of actions under §§ 547, 548 or 549 because the defendant was not a transferee within the meaning of § 550:

> THE COURT: In sum, I determine that the funds in question here, the monies transferred by debtor into the Townsquare account and then taken out of the Townsquare account were never property of Townsquare or the partners of Townsquare in any meaningful sense. The defendants had bare legal possession of these funds without any real control or ownership over them and therefore neither Townsquare Associates nor its partners are transferees within the meaning of Section 550.

In *In re Reeves*, 65 F.3d 670 (8th Cir.1995), the debtor had fraudulently deposited $65,000 into a corporation bank account. The corporation was totally unaware of this fraudulent transfer. The trustee attempted to recover the $65,000 from the corporation by arguing that the corporation was an initial transferee of an avoidable transfer. The Eighth Circuit held that the trustee had

failed to prove that the corporation was an initial transferee because the corporation never had dominion and control over the $65,000 and was a mere conduit. *Id.* at 676.

In another case very similar to the case before us, *In re Chase & Sanborn Corp.*, 813 F.2d 1177 (11th Cir.1987), a principal of the debtor was involved in a money laundering scheme. The principal laundered the funds through the debtor's bank accounts and transferred the funds to third parties. The trustee sought to avoid the transfer of the funds made by the debtor's principal to the debtor as a fraudulent transfer and argued that debtor was an initial transferee. The Eleventh Circuit held that the debtor was not an initial transferee because there was no evidence that it controlled the funds transferred from its account. *Id.* at 1182.

■ Applying *Reeves* and *Chase & Sanborn* to the instant case, it is clear that Townsquare did not have dominion or control over the funds laundered through its account whatsoever and, moreover, was completely unaware of the existence of these funds. The bankruptcy court accurately stated on the record that Townsquare "had bare legal possession of these funds without any real control or ownership over them." In fact, it was Montross who had dominion and control over the funds laundered through the Townsquare account, and he never relinquished control of these funds. *See In re M. Blackburn Mitchell, Inc.*, 164 B.R. 117, 124 (Bankr.N.D.Cal.1994). We agree, based on the applicable case law and the facts stated above, with the bankruptcy court's determination that Townsquare was not a transferee within the meaning of § 550 because it had no control over the funds which were laundered through its account.

*2. Whether The Funds In The Peninsula Bank Account Belong To The Estate*

■ The trustee argues that the bankruptcy court erred in its conclusion that the funds in the Peninsula bank account did not constitute property of the estate within the meaning of § 541 which are recoverable by the trustee pursuant to his avoiding powers. The trustee further contends that the bankruptcy court erred in granting the partner-

ship priority over the funds in the Peninsula account.

The record provides no basis as to why the funds in the Peninsula account should not be characterized as partnership funds. The bankruptcy court properly reviewed the evidence presented and determined that the funds belonged to the partnership:

THE COURT: Now, let me lastly turn to the bank accounts. The first one is fairly simple. The partnership account which I think is, again, at Peninsula Bank of Commerce, I determine that the account includes only money of the partnership and because there is going to be no recovery here awarded against the defendants, all restrictions on that account should be lifted and the partnership's ownership of all those funds free from this lawsuit should be confirmed.

Two checks totalling $65,000 were deposited into the Peninsula Bank account which represented repayment of loans from Montross to Harmony Group and Sterling Suites (corporations in which Montross held substantial interests under the name Oxford Group Trust) and consisted of funds stolen from the partnership. Based on the above, there are no facts in the record before us which support the trustee's contention that the bankruptcy court's finding was clearly erroneous.

3. *Whether The Funds In The Sunrise Bank Account Belong To The Estate*

■ Montross opened an account at Sunrise Bank on behalf of the partnership by presenting a forged instrument entitled "Partnership Agreement." Montross first began laundering funds through this Sunrise account in March, 1991, which were not used to pay Townsquare or its expenses.

On the date of Montross' bankruptcy filing, the Sunrise account had a balance of $10,826.50 which consisted of funds deposited into the account after they were stolen from Townsquare. Shortly thereafter, Montross began a series of postpetition thefts in which he transferred funds from Townsquare's bank account into the Sunrise account.

The trustee argues that the bankruptcy court erred in its decision to give Townsquare priority over the funds in the account

on the ground that the funds in the account were not Montross' property and the trustee had no interest in the account because he could only succeed to Montross' interest therein:

THE COURT: I find that the defendants' interests in this account are superior to those of plaintiff for the following reasons, and this is sort of a syllogism of several steps.

First, I note that the estate that the trustee administers succeeds only to the debtor's interest in that account as of the petition date.

Second, I note that there is no evidence whatsoever here that any funds in that account now were property of the debtor prepetition. The account descended to a zero balance after the petition was filed, namely on or about December 20th, 1993.

. . . .

The debtor had already removed from the partnership account of Townsquare all the funds to which the debtor ... had an ownership in well before the petition date and thus had no funds of his own in the Townsquare account as of [the filing date].

. . . .

There's no evidence suggesting [that the funds] came from the debtor's prepetition property and thus I conclude that as between the defendant and the plaintiff, that the defendant has a superior right to all the funds in the account.

As of the date of debtor's bankruptcy filing, the account had a balance of zero dollars. Subsequent to the filing, there were four deposits made into the account totalling about $79,000 which entirely consisted of partnership funds which Montross stole from the partnership. We agree with the bankruptcy court's finding that the trustee had no interest in the Sunrise account because the funds in the account consisted solely of funds owned by the partnership and, therefore, the bankruptcy court's findings are not clearly erroneous.

## V. CONCLUSION

The trustee failed to prove that Townsquare is a transferee within the meaning of § 550. Townsquare did not have dominion or control over the funds laundered through its account by the debtor. Only the debtor

had control over the funds in the account. The record reflects that Townsquare was unaware of the funds that debtor laundered through its account.

The bankruptcy court properly found that the funds in the Peninsula and the Sunrise accounts do not constitute property of the estate because they belong to the partnership and not the debtor.

Accordingly, we **AFFIRM.**